## Commonwealth vs. Paul R. Nolin, Jr.

Barnstable. October 6, 2006. - January 16, 2007.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Cordy, JJ.

*Homicide. Constitutional Law,* Burden of proof, Harmless error, Assistance of counsel. *Due Process of Law,* Burden of proof, Assistance of counsel. *Error, Harmless. Practice, Criminal,* Capital case, Required finding, Instructions to jury, Presumptions and burden of proof, Harmless error, Assistance of counsel, Comment by prosecutor, Argument by prosecutor. *Intent. Evidence,* Expert opinion. *Witness,* Expert.

At the trial of an indictment charging the defendant with murder in the first degree, the judge properly denied the defendant's motion for a required finding of not guilty, where, considering the evidence presented in the Commonwealth's case in its most favorable light, it was both reasonable and possible for the jury to find, beyond a reasonable doubt, that the defendant murdered the victim, and that he had done so with deliberate premeditation, and with extreme atrocity or cruelty; further, viewing the evidence at the close of all evidence did not lead to a different conclusion. [215-217]

At a murder trial, although the judge's instruction to the jury that a person is presumed to intend the natural and probable consequences of his acts was error in that it improperly shifted the burden of proof of intent to the defendant, the error was harmless beyond a reasonable doubt, where reasonable jurors would have understood the intent instruction to direct them to find an intent to kill (i.e., malice) if they concluded that the defendant inflicted the bodily injuries that actually killed the victim, which would have focused their attention on the evidence relating to the victim's injuries and their infliction; and where, given that the jury found that the injuries were inflicted by the defendant, they could not have found, even absent the erroneous instruction, that the injuries were inflicted with anything other than an intent to kill. [217-220]

The prosecutor at a criminal trial did not improperly elicit evidence of the recording of a telephone conversation in which the defendant asked a friend to contact his lawyer, where the purpose of introducing the telephone conversation was to show that the defendant's reaction to news of the discovery of the victim's body was inconsistent with innocence, and not to argue guilt from the defendant's exercise of his right to consult an attorney. [220-222]

In closing argument at a murder trial, the prosecutor argued a fair inference of sexual assault as a motive for the crime, where the defendant had raised the matter of a sexual encounter in his own testimony, and where the evidence that the victim's body was found completely naked except for

one sock, while not incontrovertible evidence of sexual assault, was consonant with that conclusion. [222-223]

At a murder trial, no prejudice to the defendant arose from the admission in evidence of the testimony of a forensic dentist (who was not on the prosecution's witness list) regarding identification of the victim's body, where the judge granted a continuance and funds to the defendant to prepare a cross-examination of the dentist. [223-225]

INDICTMENT found and returned in the Superior Court Department on November 20, 2003.

The case was tried before *Margaret R. Hinkle*, J.

*Leslie W. O'Brien* for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

CORDY, J. On September 19, 2003, Jonathan Wessner went to a party at the Falmouth home of the defendant, Paul R. Nolin, Jr. After a long night spent consuming alcohol and cocaine, the two men left in separate vehicles sometime around 7 A.M., intending to visit a landmark bell tower in Woods Hole. A witness observed Wessner parking his motor vehicle at a meter in Woods Hole at approximately 8 A.M., directed by another man in a vehicle similar in appearance to the one driven by Nolin. Wessner was not seen alive thereafter. On October 3, his body was found by a Falmouth police officer under a pile of rocks on a beach in Woods Hole, near a boathouse, horribly beaten and partially decomposed.

The investigation quickly focused on Nolin. He was arrested, indicted, and tried on charges of kidnapping and murder in the first degree. The trial judge allowed his motion for a required finding of not guilty on the kidnapping charge, but denied the motion as to the murder charge. A jury returned a verdict of guilty of murder in the first degree on theories of premeditation and extreme atrocity or cruelty.

On appeal, Nolin argues that the evidence was insufficient to support the verdict and that we should reverse the judge's denial of his motion (made at the close of the Commonwealth's evidence and renewed at the conclusion of the evidence) for a required finding of not guilty. He next assigns legal errors which he argues require a new trial. Specifically, Nolin contends that

(1) an instruction to the jury that "a person is presumed to intend the natural and probable consequences of his acts" violated his right to due process by relieving the Commonwealth of its burden to prove every element of the crime charged beyond a reasonable doubt; (2) the introduction in evidence of a conversation in which he asked to speak with his lawyer violated his right to due process; (3) the prosecutor's closing argument, in which it was suggested that Nolin had sexually assaulted the victim, was prejudicial and without support in the evidence; and (4) the trial judge abused her discretion by allowing the testimony of a forensic dentist who identified the victim's remains, when the witness was not on the original list of trial witnesses.

We conclude that the evidence was sufficient to sustain the verdict and that any legal error at trial was either harmless or failed to create a substantial likelihood of a miscarriage of justice. Accordingly, we deny Nolin's request for a new trial. We decline to exercise our authority pursuant to G. L. c. 278, § 33E and affirm the conviction.

1. *Facts.* The evidence at trial of Nolin's guilt was circumstantial. It included the following. On the night of Friday, September 19, 2003, Wessner went to the parking lot of the Falmouth Yacht Club, a popular gathering place for young adults. After receiving a telephone call, Wessner and a friend drove to a party at Nolin's home, where he met up with friends.

The guests at the party were drinking beer and liquor, and some were using marijuana. Others, including Nolin and Wessner, consumed cocaine. Wessner and Nolin conversed through the night on topics ranging from family history to religion. At some point, Nolin suggested that they visit a bell tower in Woods Hole near a church and an estate with an arched entry. He and Wessner left the party in separate vehicles sometime after 7 A.M. on Saturday morning. Nolin drove a dark pickup truck.

About 8 A.M., Nolin telephoned his employer, Thomas Tobey, to tell him that he would be late for work. Around the same time, a witness saw Wessner driving near the center of Woods Hole. Wessner pulled up next to another man in a dark pickup truck who told him to park at a meter farther down the road.

This was the last time Wessner was seen alive. Sometime after 9 A.M., a service station attendant saw Nolin drive by in a dark pickup truck, leaving Woods Hole.[1]

Tobey received another telephone call from Nolin at approximately 9:30 A.M. Nolin told Tobey that he had cut his hand and needed to go to a hospital; Tobey told him to stop by the shop later to get his paycheck. Meanwhile, also about 9:30 A.M., Rita Dziobecki, who had been at the party, returned to Nolin's house searching for her cellular telephone. She entered the house, but Nolin was not home. When Dziobecki left the house, she saw Nolin pull up in his pickup truck, park, and quickly enter a truck owned by his employer, which was marked "Tobey Plumbing & Heating." She tried to speak to him but he told her that he could not talk and had to go to work. He then drove off. Nolin arrived at Tobey's shop in Falmouth Heights about 11:30 A.M. Tobey noticed that Nolin's right hand was heavily bandaged and asked him what caused the injury. Nolin told him that he had cut himself slicing a bagel or a hamburger. (Nolin was right handed.) Tobey then told Nolin to go home and to return to work on Monday.

The next witness to see Nolin was Bernard Kelly, then a priest at St. Joseph's Roman Catholic Church in Woods Hole, located across the street from the bell tower. Nolin arrived at the church's rectory in his own pickup truck about 1 P.M., told Kelly he had to go to Nantucket, and asked if he could park the truck there. Kelly agreed, and Nolin left.

At approximately 2:30 P.M., Nolin telephoned a friend, Shawn Schirmer. He told Schirmer that he had left his home the night before with friends to go to a party, and that he was now stranded in Brockton. He asked Schirmer, who lived in Rockland, to pick him up and drive him back to Woods Hole. Schirmer picked Nolin up across the street from the parking lot of a shopping center in Brockton. Five days later, the Brockton police found Wessner's automobile parked in the same parking lot. Deoxyribonucleic acid (DNA) testing of samples taken from the steering wheel were consistent with both Wessner's

---

[1]The witness had seen Nolin drive by on other Saturday mornings about the same time, but always in his employer's truck.

and Nolin's DNA profiles. Nolin told police that he had never been in Wessner's automobile.

When Schirmer picked Nolin up in Brockton, Nolin appeared tired and said he had been up all night partying. His right hand and forearm were bandaged. During the ride, Nolin told Schirmer that he had injured himself at work. Nolin also asked Schirmer whether he had heard any news about a "kid" missing on Cape Cod. Nolin told Schirmer that he had hosted a party the week before that the "kid" had attended prior to going missing, and that the same kid had been found dead several days later. Schirmer told Nolin he had heard nothing about it. Schirmer dropped Nolin off at the rectory in Woods Hole, where Nolin's pickup truck was parked. Kelly remembered seeing the truck still parked at the rectory at 3:25 P.M., when he went to the church. The truck was gone when Kelly returned at approximately 5 P.M.

At about 3 P.M., Marie and Joseph Purdue, friends of Nolin, arrived at Nolin's home and found that he was not home. Nolin returned about 4 P.M. in his pickup truck. When asked about the bandage on his hand, Nolin told them that he had cut his hand splitting hamburgers and needed to "go back" to a hospital. He went inside the house, got his insurance card and a backpack, and left.

Just after 5 P.M., Nolin arrived at Falmouth Hospital. He was cared for by a nurse, Kathleen Hayes, and a physician's assistant. According to Hayes, the wound was "fresh," that is, it was more than "a couple of hours" old. The physician's assistant observed a three to four centimeter laceration on Nolin's right hand, contaminated with sand. When asked about its origin, Nolin told them that he had cut his hand at a barbecue at his house around noon that day. The wound was cleaned and sutured. Nolin returned home at approximately 5:45 P.M.[2]

Later that night, Nolin visited the Falmouth home of Michael

---

[2]After leaving Falmouth Hospital, Nolin went to the parking area behind a building on Main Street in Falmouth, where he was observed around 5:30 P.M. by an acquaintance, Wayne Frederick. Nolin had pulled his vehicle next to the trash receptacles. Frederick asked what he was doing. Nolin told Frederick that he was looking for a place to put his trash; Frederick asked him to use the receptacle belonging to his own business.

and Sandra Kelliher. He told them that he had cut his hand separating hamburgers. Michael asked how he cut his right hand if he was right handed. Nolin responded that he could use both of his hands. He also told Sandra that he was upset because the police were following him. When she asked why, he said it was because of the disappearance of a boy at his party.[3] Sandra told Nolin that the police would probably search his truck for blood stains. Nolin replied in a joking manner, "Oh, vinegar takes out blood."

On Monday afternoon, September 22, Wessner's mother, Julie Donahue, went to the Falmouth police station to report her son missing. There she spoke with Officer Richard Smith. Smith then contacted and interviewed several persons present at the party. One of these, Joseph Hart, contacted Nolin before he went to the station to tell him that Wessner was missing. Nolin told him that he and Wessner had gone to the bell tower in Woods Hole, then parted company.

Nolin subsequently went to the police station himself. After Officer Smith advised him of his Miranda rights, Nolin gave both an oral and a written statement. In substance, Nolin told Smith that Wessner had arrived at his home at approximately 2 A.M.; that many people there, including Nolin, began consuming cocaine; and that he and Wessner conversed about religion, and decided to visit the bell tower in Woods Hole. They went to the tower about 7:30 A.M. There Wessner offered Nolin cocaine, but Nolin refused because he had to work. After about ten minutes, they left in separate vehicles. Nolin said he then went home, arriving about 9:20 A.M. He was hungry, so he took some frozen hamburgers out of the freezer and cut his hand separating them with a knife. Nolin said he then went to Falmouth Hospital at about 10 A.M. After a one and one-half hour wait, he left to get insurance papers from his employer. He then went home about 1 P.M., where he met the Purdues. After speaking with them, he went back to the hospital where his cut was sutured. The statement made no mention of visiting a boathouse in Woods Hole, or of traveling to and from Brockton, or of the telephone call to

---

[3]As of September 20, the police were unaware of Jonathan Wessner's disappearance.

Schirmer. Nolin later admitted on the stand that while the statement was not "a lie," he did not report everything.

Officer Smith noticed extensive scratch marks on Nolin's leg, and took a photograph of these which was admitted in evidence. None of those present at the party recalled having seen these scratches on Friday night. Nolin's employer testified that the work Nolin did on Monday did not require him to crawl through any areas where he might have gotten scratched.

With Nolin's permission, Smith then went to Nolin's house. He looked for Wessner's cellular telephone, but did not find it there. He also looked inside the freezer, where he saw hamburger packages. There was no indication of blood on the hamburgers or anywhere else in the house.[4]

The Falmouth police also began a search for Wessner's vehicle. It had not been seen since Saturday, when a traffic officer in Woods Hole issued two tickets for a parking violation at a meter near where the witness testified she had seen Wessner and the man in the dark pickup truck. Those tickets were time marked 9:47 A.M. and 12:06 P.M. The first ticket was still on the windshield when the traffic officer issued the second one. Early in the morning of Thursday, September 25, a Brockton police officer found Wessner's vehicle in the same shopping center parking lot where Schirmer had picked up Nolin the Saturday before.

On the following Wednesday, October 1, Sergeant Christopher Hamilton of the Falmouth police department was fishing off the shore of Woods Hole. He noticed a flock of birds gathering at an area on the beach. When he next went on duty, Friday, October 3, Hamilton and another officer inspected the area where the birds had gathered. They found a pile of rocks, under which lay Wessner's remains, naked except for a single sock.

The body was decomposing and badly beaten, with severe trauma to the head and bones on both sides of the face broken so grievously in places that the connections were completely severed. An autopsy later revealed the one-half inch tip of a

_____

[4]Other witnesses who were present in Nolin's house at various points during the day and evening of Saturday, September 20, testified that, although they noticed food wrappers, rolls, and hamburgers left over from the party, they observed no blood.

knife blade embedded in the skull. The medical examiner determined that the cause of death was sharp and blunt force trauma. Using dental records, a forensic dentist was able to identify the body as Wessner's.

The police also searched a boathouse near where Wessner's body was discovered.[5] They found bloodstains matching the DNA profiles of both Wessner and Nolin at several locations in the building. The next day a warrant issued in the Falmouth Division of the District Court Department and Nolin was arrested.

After the Commonwealth rested, Nolin testified in his own defense. According to his testimony, while at the bell tower in Woods Hole, he and Wessner agreed to meet later "to have sex." Nolin then went home to wash up and eat. While making hamburgers he cut his hand and bandaged the wound with paper towels. He then made a telephone call to Tobey to tell him that he would be late, then went back to Woods Hole, where he met Wessner. The two went into the boathouse, where Nolin said they had consensual sexual intercourse.[6] His hand was still bleeding, and Wessner bled after intercourse.

Nolin testified that he and Wessner then returned to his house in Nolin's truck. He telephoned Tobey again to report the cut, hoping to get out of work. Nolin said that he and Wessner planned to get more cocaine and then "have sex again." He went to Tobey's, then returned home at about 12:30 P.M., where he met Wessner. Intending to go to Brockton to buy drugs, they first drove back to Woods Hole in Nolin's truck in order to get Wessner's cellular telephone out of his vehicle. Nolin left his truck at the church, and they drove in Wessner's vehicle to Brockton, where they met Schirmer, whom Nolin had telephoned earlier. According to Nolin, the three returned to Cape Cod from Brockton in Schirmer's car (leaving Wessner's vehicle in Brockton), and Nolin was dropped off at the rectory. Schirmer and Wessner left, and Nolin went home by himself. Under cross-

---

[5]The previous spring, Nolin had gone to this boathouse to check the plumbing at the direction of his employer, who was responsible for conducting the check at the end of each winter.

[6]Nolin admitted that he had been to the boathouse several times before. He also testified that he had met another man there for sexual encounters.

examination, Nolin admitted that he had not told the complete truth to the police before, out of fear of telling them about the sexual encounter.

2. *Denial of Nolin's motion for a required finding of not guilty.* In reviewing the denial of a motion for a required finding of not guilty, we must determine whether the evidence, including inferences that are not too remote according to the usual course of events, read in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. Our analysis asks not whether the evidence requires a finding of guilty, but whether it permits such a finding beyond a reasonable doubt. *Commonwealth* v. *Platt*, 440 Mass. 396, 401 (2003). Circumstantial evidence alone may be sufficient to meet this burden. *Id.* See *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). "We consider the state of the evidence both at the close of the Commonwealth's case and at the close of all the evidence." *Commonwealth* v. *Palmariello*, 392 Mass. 126, 142 (1984).

Viewing the evidence presented in the Commonwealth's case in its most favorable light, the jury could have found that at Nolin's suggestion, Nolin and Wessner traveled to Woods Hole between 7 and 8 A.M. on September 20, after consuming alcohol and cocaine, to visit the bell tower on the Woods Hole waterfront; that they parked their vehicles near each other; and that Wessner disappeared thereafter. They also could have found that, once at the Woods Hole waterfront, Wessner and Nolin went to a boathouse, about which Nolin had knowledge and access; that a bloody struggle ensued; that sometime after the struggle, Nolin left Woods Hole alone with a wound to his hand; and that Wessner's body was found buried under rocks in close proximity to the boathouse. The jury further could have found that Nolin returned to Woods Hole later that day, left his truck at the rectory, and drove Wessner's vehicle to a shopping center parking lot far from Cape Cod, in order to throw off suspicion from himself; and that his deceitful actions, including multiple lies to the police and friends alike, about his activities that day, were the product of a guilty conscience and of a concerted effort to cover up his crime. Added to this evidence

was medical evidence from which the jury could have found that Wessner died of blunt and sharp force trauma to the head, including a knife driven into his skull and multiple blows delivered to his face and head with tremendous force.

Considering this evidence, it was both reasonable and possible for the jury to find, beyond a reasonable doubt, that Nolin murdered Wessner, and that he had done so with deliberate premeditation,[7] and with extreme atrocity or cruelty.[8] Viewing the evidence again at the close of all the evidence does not lead us to a different conclusion. The sufficiency of the Commonwealth's case did not deteriorate during the defense's case. See *Commonwealth* v. *Platt*, 440 Mass. 396, 403-404 & n.9 (2003) (defendant's evidence only considered if Commonwealth's case "deteriorated" after Commonwealth rested but before close of evidence; contradictory testimony of defendant does not constitute deterioration); *Commonwealth* v. *Pike*, 430 Mass. 317, 323 (1999) (deterioration occurs when Commonwealth's evidence shown to be incredible or conclusively incorrect). If anything, the evidence against Nolin may have been strengthened by his admission of having been in the boathouse with Wessner, and having repeatedly lied about the events of that day. The jury were able to assess directly Nolin's credibility, and to determine whether his testimony, which was substantially at variance with his prior statements, was the truth or an attempt to weave a tale of innocence through and around

---

[7]"Deliberate premeditation means that the plan to kill was formed after deliberation and reflection. However, no particular length of time is required in order for deliberate premeditation to be found." *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974), and cases cited. "It is not so much a matter of time as of logical sequence. First, the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v *Palmariello*, 392 Mass. 126, 143 (1984), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905). In a circumstantial case, the number and severity of the injuries such as present here is sufficient to show that the perpetrator deliberately premeditated the murder. *Commonwealth* v. *Palmariello*, *supra* at 144.

[8]A conviction of murder on grounds of extreme atrocity or cruelty requires proof of one or more of the factors we outlined in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). Here, the jury could have found that several of those factors were present. Wessner's remains spoke of a brutal and violent death. The extensive injuries required great force to impart, and were of a proportion well beyond that required to cause death.

what he then knew was the Commonwealth's evidence of his guilt. The judge properly denied Nolin's motion for a required finding of not guilty of murder.

3. *Jury instruction on intent.* At the Commonwealth's request, and over Nolin's objection, the judge instructed the jury that "a person is presumed to intend the natural and probable consequences of his acts. So, in considering intent, remember that."[9] Nolin contends that this was error.[10] We agree, but conclude that the error was harmless beyond a reasonable doubt.

In *Sandstrom* v. *Montana*, 442 U.S. 510 (1979) (*Sandstrom*), the United States Supreme Court held that an instruction of this type improperly shifts the burden of proof to the defendant and therefore violates his right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.* at 524. The Commonwealth has the burden of proving every element of a crime beyond a reasonable doubt. See *id.* at 520, quoting *In re Winship*, 397 U.S. 358, 364 (1970). This burden includes proving intent, which in murder in the first degree is defined as "malice."[11] A jury instruction that "a person is presumed to intend the natural and probable consequences of his acts" improperly relieves the Commonwealth of that burden because it "conflict[s] with the overriding presumption of in-

___

[9] Aside from this error, the judge otherwise correctly stated and explained the elements of the crime charged, and repeatedly stressed the Commonwealth's burden to prove all elements beyond a reasonable doubt.

[10] For the same reasons we so conclude here, the Commonwealth concedes in its brief that this instruction was erroneous.

[11] In general, "[m]alice aforethought may be shown by proof that the defendant, without justification or excuse, intended [1] to kill the victim or [2] to do the victim grievous bodily harm. . . . However, proof of such an intent is not required because malice aforethought may be inferred if, [3] in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Gray*, 399 Mass. 469, 470 n.1 (1987) (Citations omitted.) These are the so-called "three prongs of malice." "[O]nly first prong malice supports a deliberate premeditation conviction." *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). Thus, under a deliberate premeditation theory, the Commonwealth must prove beyond a reasonable doubt that the defendant acted with the intent to cause death. See *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995).

nocence with which the law endows the accused and which extends to every element of the crime." *Sandstrom, supra* at 523, quoting *Morissette* v. *United States,* 342 U.S. 246, 275 (1952). See *Commonwealth* v. *Moreira,* 385 Mass. 792, 794 (1982) (citing *Sandstrom,* noting "it is constitutionally impermissible to shift to a defendant the burden of disproving an element of a crime charged"). Put another way, while the act of killing is not in itself sufficient to prove the element of intent, the presumption commands the conclusion that it is.

An unconstitutional burden-shifting instruction is not grounds to upset a verdict if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman* v. *California,* 386 U.S. 18, 24 (1967). The Supreme Court described the proper analytical framework for this inquiry in *Yates* v. *Evatt,* 500 U.S. 391 (1991) (*Yates*). We have followed *Yates* when analyzing burden-shifting instruction errors. See, e.g., *Commonwealth* v. *Medina,* 430 Mass. 800, 802-803 (2000) (*Medina*). Finding that an improper instruction was harmless beyond a reasonable doubt is the equivalent of saying that the error was "unimportant in relation to everything else the jury considered on the issue in question," requiring the reviewing court "to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption." *Yates, supra* at 403, 404. Cf. *Commonwealth* v. *Torres,* 420 Mass. 479, 490-491 (1995), and cases cited (*Torres*) (instructions considered in context of entire charge, probable impact assessed with reference to reasonable juror).

The *Yates* analysis involves two steps. First, "the reviewing court must determine what evidence the jury actually considered in reaching their verdict — a determination made by analyzing the language of the instructions given to the jury and applying the customary assumption 'that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.' " *Medina, supra* at 802-803, quoting *Yates, supra* at 404. In the second step, the court must "weigh the probative force of that evidence against the probative force of the presumption standing alone." *Medina,*

*supra* at 803, quoting *Yates*, *supra*. For the jury's verdict to stand, a reviewing court must conclude that the evidence considered was "so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [improper] presumption." *Medina*, *supra*, quoting *Yates*, *supra* at 405.

Applying the first step of the *Yates* analysis, we conclude that reasonable jurors would have understood the intent instruction to direct them to find an intent to kill — that is to say, the element of malice — if they concluded that Nolin inflicted the bodily injuries that actually killed Wessner. This would have focused their attention on the evidence relating to Wessner's injuries and their infliction. We have already recounted this evidence in detail above.

This leads to the second *Yates* step, analyzing the probative force of the evidence without the improper presumption. Setting aside the element of malice, the jury plainly concluded that Nolin unlawfully killed Wessner by inflicting severe and extensive injuries to his face and upper body, including by piercing his skull with a knife. The jury having found that these injuries were inflicted by Nolin, we are confident in concluding that, even absent the erroneous instruction, the jury could not have found that they were inflicted with anything other than an intent to kill. *Medina*, *supra* at 808 ("In light of the evidence regarding the nature of the assault on the victim . . . the jury's finding the predicate fact of an unlawful killing was the functional equivalent of their finding the ultimate fact to be presumed, malice").

A specific intent to kill (first prong malice) will also support a conviction under a theory of extreme atrocity or cruelty (so long as one of the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 [1983], is present). Consequently, we need not analyze that theory separately with respect to the erroneous instruction. Yet even if we were to conclude that the jury might not have found a specific intent to kill absent the erroneous instruction (thereby undermining the deliberate premeditation theory), we would still conclude that the jury would have found second and third prong malice, either of which may support a conviction of murder in the first degree by

reason of extreme atrocity or cruelty. *Commonwealth* v. *Judge*, 420 Mass. 433, 442-443 (1995). Wessner's injuries could not have been inflicted without an intent to do grievous bodily harm. Similarly, it is implausible that a reasonably prudent person would not know that the injuries he inflicted had a "plain and strong likelihood" of causing death. The Commonwealth need prove only one theory of murder in the first degree. If a jury return a guilty verdict based on two theories, the verdict will remain undisturbed even if only one theory is sustained on appeal. See *Commonwealth* v. *Chipman*, 418 Mass. 262, 270 n.5 (1994), and cases cited.

4. *Introduction of Nolin's request to speak with his attorney.* Through the testimony of Nolin's friend, Judith Rudd, the Commonwealth introduced a recording of a telephone conversation between Nolin and Rudd.[12] In the course of that conversation, Rudd tells Nolin that the police have found Wessner's body. Nolin responds by asking, "when," and then tells Rudd (among other things) to have "Bob" come see him and that "I want him up here now." After the recording was played, the prosecutor asked Rudd to identify the various people discussed in the conversation. When asked who "Bob" was, Rudd said, "I believe that was Bob Nolan, Paul's lawyer." Nolin did not object to the question or move to strike the answer.

Both the prosecutor and defense counsel discussed the tape recording in their respective closing arguments. The prosecutor argued that Nolin's statements to Rudd were inconsistent with the claims of innocence he had made on the stand. He made no mention of "Bob" or "his lawyer," nor was there any reference to Nolin's having asked to see him.[13] Nolin's counsel argued that the conversation merely showed the worry of an innocent

---

[12] At the time of the conversation, Nolin was being held at the Barnstable County house of correction.

[13] In relevant part, the prosecutor said:

> "Ladies and gentlemen, what about the tape of the phone call? You're wrongfully accused, let us say, and you are sitting in jail; and you get this phone call from Miss Rudd, and she says they found the body.
>
> "You listen to that tape. Is that the reaction you would have? He says, 'Oh, my God.' His only question is 'when.' Not who killed the

man wrongfully accused.[14] Nolin now argues that the introduction of his request that Rudd contact his lawyer violated his due process rights under the United States and the Massachusetts Constitutions. Because Nolin made no objection at trial, "our review is governed by the substantial likelihood of a miscarriage of justice standard." *Commonwealth* v. *DePace*, 433 Mass. 379, 382 (2001), *S.C.*, 442 Mass. 739 (2004), cert. denied, 544 U.S. 980 (2005).

Both this court and the United States Supreme Court have held that it is a violation of due process for a prosecutor to comment on or elicit evidence of a defendant's exercise of his right to remain silent after receiving Miranda warnings. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983). See also *Doyle* v. *Ohio*, 426 U.S. 610 (1976); *Commonwealth* v. *DePace*, *supra* at 383 (applying similar rule to postarrest, post-Miranda decision to request attorney). The protections afforded by these cases are not directly applicable here, where the statements at issue were made by Nolin to a friend and not in response to police interrogation.

---

boy, not where was he buried, not how was he killed. The reason, ladies and gentlemen, that you don't ask those questions is you already know the answer. And now, ladies and gentlemen, so don't you."

[14]In relevant part, defense counsel said:

"Ladies and gentlemen, we heard about a telephone call, conversation between Judy Rudd and Mr. Nolin when he was at the jail. We heard the tape. And he said something like — she said they had found the body. Oh, my God.

"Well, I submit to you that that's a reaction — he's in jail for murdering Jonathan Wessner. He's now in jail charged with that; and that's his reaction. And I suppose you can read anything you want into it. Because people make all kinds of reactions when they get bad news, for whatever reason.

"Judy Rudd talked to him about, Well, we knew this would happen. And that was explained. And the lawyer had advised that either Mr. Wessner will be found alive, or they'll find his body eventually. I submit there was nothing criminal in that phone call. Nothing out of the ordinary about it either. And certainly not enough to say there's some proof he committed this vicious murder, and he ought to be found guilty of it."

Nonetheless, this court has held that the due process protection embodied in the prohibition against arguing guilt from a defendant's decision to consult a lawyer extends beyond the police interrogation context. In *Commonwealth* v. *Person,* 400 Mass. 136 (1987), we reversed a conviction of murder in the second degree because the prosecutor, in his summation, "sought to have the jury draw an inference of guilt from the defendant's [prearrest] decision to consult an attorney." *Id.* at 141. This, we said, "he may not do. 'The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt.' *Commonwealth* v. *Burke,* 339 Mass. 521, 533 (1959). . . . A defendant's decision to consult an attorney is not probative in the least of guilt or innocence, and a prosecutor may not 'imply that only guilty people contact their attorneys.' " *Commonwealth* v. *Person, supra,* quoting *Zemina* v. *Solem,* 438 F. Supp. 455, 466 (D.S.D. 1977), aff'd, 573 F.2d 1027 (8th Cir. 1978).

Nolin did not pay such a price for consulting his attorney in this case. His brief observes, correctly, that "[t]he purpose of introducing the telephone conversation could only have been to show, as the prosecutor argued, that the defendant's reaction to news of discovery of the body was inconsistent with innocence." The central focus of the recording, the prosecutor's questions about the recording, and the argument in his closing was the questions Nolin asked (and did not ask) about the discovery of Wessner's body. Other than asking Rudd, "Do you know who [Bob] is?," the prosecutor made no mention of or argument premised on Nolin's request that Rudd send his attorney. While it is possible that the close connection between the questions about the body and the request for "Bob" could have been understood as an implied argument linking the request for an attorney to consciousness of guilt, we see no indication that the prosecutor intended or encouraged the jury to draw that conclusion, and, on this record, find no error. However, even if we were to find error in the prosecutor's asking the question, "Do you know who [Bob] is?," we see no basis on which to conclude that this error created a substantial likelihood of a miscarriage of justice.

5. *Prosecutor's closing argument.* In his closing, the prosecu-

tor argued that "[t]here is no evidence of a sexual assault here from the Medical Examiner because there was nothing left to examine on that point, you might conclude having heard this evidence. But can you find that in all of this evidence, ladies and gentlemen? You most certainly can." Later, after recounting the evidence, he concluded, "The evidence leaves virtually no doubt that Paul Nolin viciously murdered that young boy who rejected his sexual assaults." Nolin claims that this argument was not supported by the evidence, violating his rights to due process and a fair trial.

"It is beyond debate that counsel must restrict closing argument to the evidence and the fair inferences that might be drawn therefrom." *Commonwealth* v. *Arroyo*, 442 Mass. 135, 146-147 (2004). "[I]n this regard, the Commonwealth 'and its prosecutors are held to a stricter standard of conduct than are errant defense counsel and their clients.' " *Id.* at 147, quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 519 (1987). We discern no error in the prosecutor's statements. His discussion of the evidence was fair, even pointing out the primary evidentiary weakness of his argument, that there was no evidence of sexual assault found in the autopsy. The inference he asked the jury to draw (presumably to provide a motive for the crime) was based on facts in evidence. Nolin himself raised the matter of a sexual encounter in his own testimony, both to explain why he had gone with Wessner to Woods Hole and to account for the presence of blood in the boathouse. The prosecutor also pointed to testimony that Wessner's body was found completely naked except for one sock. While this may not be incontrovertible evidence of sexual assault, it is consonant with that conclusion. The prosecutor thus argued a fair inference.[15]

6. *Expert testimony of the forensic dentist.* Nolin last assigns

[15]Nolin suggests that there is a particular risk of prejudice here because the alleged sexual assault was homosexual. We have previously recognized the need for trial judges to be sensitive to this question. See *Commonwealth* v. *Plunkett*, 422 Mass. 634, 641 (1996) ("The subject of juror attitudes toward homosexuality may be important in a case such as this"). Here, though, we conclude that there was no undue bias, either in the prosecutor's statements or in the trial as a whole. The prosecutor made no unnecessary repetition of the fact that the alleged assault was homosexual, nor did he make any unduly graphic description of it. He did not otherwise raise the topic at trial except when Nolin himself testified that he had taken Wessner to the boat house for

error to the judge's permitting the testimony of a forensic dentist. Although the dentist had done the initial identification of the body, which was noted in the medical examiner's report, the dentist's report was not in the medical examiner's file received by either the prosecutor or the defense. When Nolin objected to the medical examiner's testifying to the identification based on the dentist's worksheet, the prosecutor offered to produce the dentist herself. Nolin objected to the testimony because the dentist was not on the witness list, and because he had not been able to prepare for her testimony. The judge overruled the objection, but authorized $1,000 for Nolin to hire his own expert, granted a voir dire of the dentist, and delayed the testimony by several days. Nolin was unable to obtain another dental expert. The dentist testified, again under objection, and made the identification on the stand.

There is no evidence or suggestion that the failure to disclose the dentist's documents was deliberate.[16] Additionally, Nolin gave no prior indication that he intended to challenge either the identification of the victim in the autopsy report, or the basis of that identification. "Absent a showing of bad faith, we consider the primary issue of prejudice. In measuring prejudice, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant "to make effective use of the evidence in preparing and presenting his case." ' " *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980). Any consequences from the delay adverse to Nolin were sufficiently mitigated by the judge's grant of delay and funds to prepare the cross-examination of the dentist. As there was no serious dispute that the body found was Wessner's, additional time would have been of no use to Nolin, even if he had been able to find his own expert.

---

sex. For her part, the judge at voir dire told each member of the venire that the case would include evidence of "homosexual activity," and excluded anyone who did not affirmatively and unequivocally state that this would not affect his or her ability to decide the case fairly and impartially. In line with our discussion in *Commonwealth* v. *Plunkett, supra*, this was an appropriate inquiry to protect Nolin's right to an impartial jury.

[16]The judge found specifically that the Commonwealth had not violated its discovery obligations.

"The trial judge has significant discretion in deciding whether late-discovered or late-disclosed witnesses should be excluded from testifying, or whether a continuance is appropriate." *Commonwealth* v. *Trapp*, 423 Mass. 356, 363-364, cert. denied, 519 U.S. 1045 (1996). In this case, the judge properly exercised that discretion by granting Nolin time and funds to prepare his examination of the dentist. We find no error in the decision to allow the dentist to testify.

7. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record in this case in accordance with the provisions of G. L. c. 278, § 33E. We find no grounds to exercise our extraordinary authority under that section.

*Judgment affirmed.*