## COMMONWEALTH vs. JAMIE CUNDRIFF.

Suffolk. September 9, 1980. — December 16, 1980.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Search and Seizure,* Forcible entry by police. *Practice, Criminal,*
Disclosure of evidence, Instructions to jury.

History of the common law rule that police officers cannot make an un-
announced entry into a dwelling house. [140-147]
At a criminal trial, evidence that police officers suspected the defendant
of participating in an armed robbery in which both handguns and a
sawed-off shotgun had been used and that they considered the defend-
ant armed and dangerous warranted a finding that the police were
justified in failing to identify themselves and announce their purpose
prior to forcibly entering the defendant's apartment. [147-148]
A defendant was not entitled to a new trial on the ground that an incrimi-
nating statement made to the police by the defendant was not disclosed
prior to trial as required by a pretrial discovery agreement where the
delay in disclosing the defendant's statement was not caused by the
malice or negligence of the police or the prosecutor and where there
was no showing that the defendant was significantly prejudiced by the
belated disclosure or that a new trial would remedy any such preju-
dice. [148-151]
Although it would have been preferable if the judge at a criminal trial
had not appeared to equate the interests of the jurors and the interests
of the Commonwealth in his charge to the jury, the charge, viewed in
its entirety, was fair and well-balanced and did not mislead the jury as
to their duties, functions, and obligations. [152-153]

INDICTMENTS found and returned in the Superior Court
Department on October 4, 1978.

The cases were tried before *Ronan,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*William J. Leahy* for the defendant.

*Leonard J. Henson,* Assistant District Attorney, for the
Commonwealth.

ABRAMS, J.  The defendant was found guilty by a jury on seven indictments charging him with armed robbery while masked (G. L. c. 265, § 17), and one indictment charging armed assault with intent to rob (G. L. c. 265, § 18), and was sentenced to concurrent terms of from fifteen to twenty-five years' imprisonment at the Massachusetts Correctional Institution at Walpole.[1]  The defendant appealed pursuant to G. L. c. 278, §§ 33A - 33G.  On appeal, Cundriff raises three issues:  (1) the denial of a motion to suppress evidence based on a claim that the police entered Cundriff's apartment without an announcement of their identity and purpose;  (2)  the denial of a motion to grant a mistrial because a statement made to police by the defendant was not disclosed prior to trial; and (3)  an erroneous instruction to the jury.  We granted the defendant's application for direct appellate review.  We find no error and affirm the convictions.

We summarize the facts.  About two o'clock on the afternoon of August 23, 1978, four men wearing stocking masks and carrying guns entered the Casa de Hombre hairdressing salon at 1222 Blue Hill Avenue in Boston's Mattapan neighborhood.  The nine customers and employees present in the shop at the time were ordered to lie on the floor, then were tied up or bound and robbed of money and jewelry.  The robbers also took a telephone, a telephone answering machine, and a backgammon set.  Three of the men remained masked throughout the robbery, but the fourth man raised his mask momentarily, allowing one of the victims to see part of his face.

About 2:30 P.M. that day, two Boston police detectives, who had not yet learned of the robbery, saw four men running across a street not far from the Casa de Hombre.  When the four split into two groups, the police followed one pair, later identified as Jamie and Cedric Cundriff, and stopped them.  Cedric, who was carrying a telephone and a telephone answering machine, was placed under arrest for

---

[1] Cundriff's codefendants, Darryl E. Redding and Gregory Wilson, were found guilty on the same charges.

receiving stolen property. Jamie, who was carrying a backgammon set, was not arrested.

As the police were taking Cedric to the police station, they received a radio dispatch telling them of the holdup at the Casa de Hombre, and they drove to the scene. Upon their arrival, several persons identified Cedric as one of the participants in the robbery, and the proprietor of the hairdressing salon identified the telephone answering machine as the one taken from the shop. A search of Cedric revealed several black nylon stocking caps and a number of pieces of jewelry taken in the robbery.

*The forcible entry of Cundriff's apartment.* On October 13, 1978, at approximately 6:45 A.M., a group of police officers went to Jamie Cundriff's apartment with an arrest warrant. It was still dark when the police arrived and knocked at the door. When a woman inside the apartment asked, "Who is it?" one officer answered, "School bus."

A woman opened the door, and several officers rushed into the apartment with their weapons drawn. One officer remained outside while the other officers entered rooms throughout the apartment. Several officers went into a bedroom, where Jamie Cundriff, only partially clothed, was lying on the bed, next to a young child. Cundriff was placed under arrest. One of the officers, who had been present when the two Cundriff brothers were stopped on the street the day of the robbery, saw a backgammon set in Jamie Cundriff's apartment, recognized it as the one Jamie Cundriff had been carrying that day, and seized it.[2]

Cundriff claims that the judge erred by failing to suppress the backgammon set seized as a result of an unlawful entry into the apartment. He argues that the entry of the police into his apartment was unlawful, since the police failed to identify themselves and did not state their purpose, in violation of our common law rule that officers cannot make an

---

[2] One of the policemen who was present in Cundriff's apartment testified that the backgammon set was in plain view on top of a bureau in the bedroom. Cundriff testified that the set was in the living room in open view.

unannounced entry into a dwelling house[3] except in limited circumstances not here present. The judge assumed that the knock and announce rule was a part of our common law, ordered a hearing, and then ruled that making such an announcement would have endangered the lives of the officers or other persons, and hence, the failure of the officers to knock and announce their identity and purpose was justified. We conclude that the judge was correct both in recognizing the rule as a part of our common law and in recognizing that the failure of the police to make an announcement may sometimes be justified.

Our examination of the history of this rule must begin with the English common law.[4] Three reasons appear as the basis for the development of the rule in England. In medieval England private persons often used self-help to recover stolen chattels. At that time possession was protected since "to allow men to make forcible entries on land or to seize goods without form of law, is to invite violence." 2 F. Pollock & F. Maitland, The History of the English Law, 41 (2d ed. 1899). In addition to using the announcement requirement as a means of decreasing potential violence, the requirement of an announcement also served to protect the peace, tranquility, and privacy of an owner. "The possessor's possession is protected, not indeed because he has any sort of right in the thing, but because in general

---

[3] Cundriff limits the issue raised to the requirement that police knock and announce their purpose before entering a dwelling house to make an arrest. Thus, we do not consider police entries into other types of structures.

[4] Commentators suggest there were ancient sources for the English knock and announce rule. One commentator points to a rule in ancient Rome where a person searching for stolen goods had to have a public crier proclaim the theft of the goods and describe the goods before being able to search the house where it was thought the goods were located. See N.B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution, 17-18 (1970). Another commentator finds support for the origin of the English law in biblical law. See *Deuteronomy* 24:10 (which prohibits a creditor from entering his debtor's house to obtain security for his debt). See Note, Announcement in Police Entries, 80 Yale L.J. 139, 140 n.5 (1970).

one can not disturb his possession without being guilty, or almost guilty, of some injury to his person, some act which, if it does not amount to an assault, still comes so dangerously near to an assault that it can be regarded as an invasion of that sphere of peace and quiet which the law should guarantee to every one of its subjects." *Id.* at 41-42. Lastly, the requirement of a statement of identity and purpose gave the property owner an opportunity to permit peaceable entry and thereby protect the home from physical destruction. See *Lee* v. *Gansel*, 98 Eng. Rep. 935, 938 (K.B. 1774), where Lord Mansfield set forth the need to prevent those executing warrants from breaking doors or windows, for "otherwise the consequences would be fatal: for it would leave the family within, naked and exposed to thieves and robbers."[5]

The first case applying a knock and announce requirement on public officers is *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603), which contains the following dictum.

---

[5] The United States Supreme Court has, for many of the same policy reasons set forth by the English courts, held that the knock and announce rule is required for Federal officers in all but exceptional circumstances. "Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house." *Miller* v. *United States*, 357 U.S. 301, 313 (1958). The Court also recognized that the knock and announce rule may serve to protect the safety of policemen, "who might be mistaken for prowlers and be shot down by a fearful householder." *Id.* at 313 n.12.

In addition, Mr. Justice Brennan noted that today there is a "very real" possibility that police may be misinformed as to the name or address of a suspect, or as to other material allegations. "That possibility is itself a good reason for holding a tight rein against judicial approval of unannounced police entries into private homes." *Ker* v. *California*, 374 U.S. 23, 57 (1963) (Brennan, J., dissenting). See generally Blakey, The Rule of Announcement and Unlawful Entry: *Miller* v. *United States* and *Ker* v. *California*, 112 U. Pa. L. Rev. 499 (1964); Sonnenreich and Ebner, No-Knock and Nonsense, An Alleged Constitutional Problem, 44 St. John's L. Rev. 626 (1970); Note, Announcement in Police Entries, 80 Yale L.J. 139 (1970), which marshal arguments for and against the knock and announce rule.

At least forty jurisdictions have some form of knock and announce rule for searches or arrests, based either on statute or on common law. See generally 44 St. John's L. Rev., *supra* at 654-659.

"In all cases when the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . ." The requirement that royal officers first identify themselves and announce their purpose before entering rested in part on the notion that the "house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose . . . ." *Id.*

Following *Semayne's Case*, the English courts, in *Curtis's Case*, 168 Eng. Rep. 67 (Crown 1756), dealt directly with the knock and announce requirement in a criminal case. The court held that "peace-officers, having a legal warrant to arrest for a breach of the peace, may break open doors after having demanded admittance and given due notice of their warrant." *Id.* at 68. The majority also held that "no precise form of words is required" to constitute adequate notice, as long as the announcement suffices to inform the occupant that the person demanding entry is not a trespasser but someone who "claim[s] to act under a proper authority." *Id.*

In *Launock* v. *Brown*, 106 Eng. Rep. 482, 483 (K.B. 1819), the judge stated that while he did not know if the announcement rule should apply to felony cases, "in the case of a misdemeanour, such previous demand is requisite." The judge reasoned that the rule was required in such a case because if no demand is made, "how is it possible for a party to know what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property, which he will be justified in resisting to the outmost." *Id.* at 483.

The early English authorities are in accord. Sir Matthew Hale wrote, "A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them . . . ." 1 Hale, Pleas of the Crown 583 (1800). See 2 Hawkins, Pleas of the Crown c. 14, § 1 (6th ed. 1787); Foster, Crown Law 320-321 (1762). See also *Ker* v. *California*, 374 U.S. 23, 47-48 n.1 (1963) (Brennan, J.,

dissenting) ("the leading commentators upon the English criminal law affirmed the continuing vitality of [*Semayne's Case*]").[6]

British search policies generally are acknowledged to have spurred on revolutionary sentiment in colonial Massachusetts. Opposition to the search policies centered upon the use by British customs house officers of the writs of assistance, general warrants which allowed officers of the crown to search, at their will, wherever they suspected untaxed goods to be, and granted the officials the right of forcible entry. See generally O.M. Dickerson, The Navigation Acts and the American Revolution (1974); N.B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1970); H.H. Miller, The Case for Liberty 121-144 (1965).[7]

It is not clear how often forcible entries were preceded by a knock and announcement of purpose. The colonists did not list the failure of the king's officers to announce their identity and purpose among their complaints about the writs.[8]

---

[6] While the early English law was unclear on the issue of the application of the announcement rule to the execution of search warrants, see Blakey, The Rule of Announcement and Unlawful Entry: *Miller* v. *United States* and *Ker* v. *California*, 112 U. Pa. L. Rev. 499, 503-504 (1964), the requirement of a prior announcement in cases of arrests appears never seriously to have been disputed. See *Miller* v. *United States*, 357 U.S. 301, 308 (1958) ("Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the breaking was unlawful where the officer failed first to state his authority and purpose for demanding admission"); *Accarino* v. *United States*, 179 F.2d 456, 462 (D.C. Cir. 1949).

[7] One history of the period notes that while forcible entries were allowed only in the case of resistance, the writs employed in Massachusetts, especially in the early years of their use, "were so loosely worded as to omit specifications of even this restriction." N.B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 54 n.16 (1970).

[8] This has led some to believe that these searches were accompanied by notice and announcement of purpose. The act which created the writs of assistance appears to include a knock and announce requirement because it provided that the officer could "*in case of resistance*, . . . break open doors, chests, trunks and other packages, there to seize and from thence to bring, any kind of goods or merchandise whatsoever, prohibited and un-

Nevertheless the colonists' memory of the use and abuse of
the writs was one of the reasons for the adoption, by several
colonies, of constitutional safeguards regulating searches.[9]
In 1780 Massachusetts enacted art. 14[10] of the Massachu-
setts Declaration of Rights, specifically condemning "unrea-
sonable searches, and seizures."[11]  J.W. Landynski, Search
and Seizure and the Supreme Court 38 (1966); N.B. Lasson,
The History and Development of the Fourth Amendment to
the United States Constitution 82 (1970).

The antipathy of Massachusetts colonists to the writs of
assistance was forcefully expressed by James Otis in the
Massachusetts Superior Court in 1761. See Quincy, Reports
(Appendix) 469-482 (1865); 2 Legal Papers of John Adams
106-147 (L. Wroth & H. Zobel eds. 1965). Otis is said to
have stated in his argument that the writ of assistance was
"the worst instrument of arbitrary power, the most de-
structive of English liberty, and the fundamental principles
of the constitution, that ever was found in an English law-
book. . . . It is a power that places the liberty of every man
in the hands of every petty officer. . . . Custom house
officers may enter our houses when they please — we are

---

customed" (emphasis added). 13-14 Car. 2, c. II, c. 11, §§ IV, V; made
applicable to colonies: 7-8 Will. 3, c. 22, § VI (1696). See Note, 80 Yale
L.J., *supra* at 145 n.25.

[9] In 1776, Virginia enacted art. X of its Declaration of Rights, which
specifically denounced general warrants as "grievous and oppressive."
Other colonies followed suit shortly thereafter. See J.W. Landynski,
Search and Seizure and the Supreme Court 38 (1966).

[10] Article 14 provides: "Every subject has a right to be secure from all
unreasonable searches, and seizures, of his person, his houses, his papers,
and all his possessions. All warrants, therefore, are contrary to this right,
if the cause or foundation of them be not previously supported by oath or
affirmation; and if the order in the warrant to a civil officer, to make
search in suspected places, or to arrest one or more suspected persons, or
to seize their property, be not accompanied with a special designation of
the persons or objects of search, arrest, or seizure; and no warrant ought
to be issued but in cases, and with the formalities prescribed by the laws."

[11] At least one historian believes that the wording in art. 14 prohibiting
"unreasonable searches, and seizures" served as the model for the Fourth
Amendment to the United States Constitution. Landynski, *supra* at 38.

commanded to permit their entry . . . ." 2 Legal Papers of John Adams, *supra* at 140-142. See 2 C. Adams, The Works of John Adams 524 (1850); Landynski, *supra* at 35-37. The fact that Otis limited his stinging criticism to general warrants may be said to suggest that the customs officers complied with the knock and announce rule. See Note, Announcement in Police Entries, 80 Yale L.J. 139, 145 n.26 (1970). See also note 8, *supra*.

Our early cases reflect acceptance of the announcement rule. *Oystead* v. *Shed*, 13 Mass. 520, 523 (1816), though turning on a procedural point, emphasized the right of a lodger to be free from forcible entry into his dwelling house in the case of civil arrest. In *Barnard* v. *Bartlett*, 10 Cush. 501, 503 (1852), we stated that a police officer attempting to serve a criminal arrest warrant could forcibly enter a suspect's house "after a proper notification of the purpose of the entry, and a demand upon the inmates to open the house, and a refusal by them to do so." A similar statement was made in *Jacobs* v. *Measures*, 13 Gray 74, 75 (1859) ("An officer, in the execution of valid criminal process, is justifiable in breaking the outer door of a dwellinghouse, after demanding admittance and being refused").[12]

In *Commonwealth* v. *Reynolds*, 120 Mass. 190 (1876), we applied this principle to a case where the police broke into one person's house with a misdemeanor warrant for the ar-

---

[12] In *McLennon* v. *Richardson*, 15 Gray 74 (1860), we considered the legality of warrantless arrests made in the course of a raid on a shop where, it was alleged, liquor was sold unlawfully. The court stated that the authority of a police officer to break into a house or shop and make an arrest without a warrant was limited to cases involving felonies, treason, or breaches of the peace committed in the presence of a police officer, and held that the offense with which the defendant in *McLennon* was charged did not fall within that limited class of cases. *Id.* at 77. Even if it had, the court reasoned, the officer could not break open the door without first "demanding entrance." *Id.* at 78. The McLennon court found that there was no proof that "any such demand was made as to give the plaintiff notice that the defendant, as an officer of the law, sought an entrance into his premises." *Id.* Early New Hampshire and Connecticut cases reached conclusions similar to those of the Massachusetts cases. See *State* v. *Smith*, 1 N.H. 346 (1818); *State* v. *Shaw*, 1 Root 134 (Conn. 1789); *Read* v. *Case*, 4 Conn. 166 (1822).

rest of another person: "Even in a case of a misdemeanor, while it has been held in some cases that, before breaking open the outer door, the officer should demand admission, it is fully recognized in all the cases, that, after such demand and its refusal, the officer may lawfully enter by force and serve his process, even if it be against the occupant of the house." *Id.* at 196.[13]

History teaches that the announcement requirement is a part of our common law. We add that the policies underlying the announcement rule at common law, i.e., decreasing the potential for violence, protection of privacy, and the prevention of unnecessary damage to homes, are as valid today as they were in the past. The judge below recognized that the rule was an integral part of our common law and held a hearing to determine whether there was reason to excuse the failure of the police to identify themselves and state their purpose.

American law early developed an exception to the announcement rule if there was reason to believe that "[i]mminent danger to human life, resulting from the threats and intended violence of the principal [defendant] . . ." would result from compliance with the rule. *Read* v. *Case,* 4 Conn. 166, 170 (1822).[14] The California Supreme Court also has held that the knock and announce rule is "limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest

---

[13] Few recent Massachusetts cases have dealt with the knock and announce issue. In *Commonwealth* v. *Rossetti,* 349 Mass. 626 (1965), the defendant moved to suppress evidence seized during a search of the premises of an alleged bookmaker both on the grounds that the warrant was issued without probable cause, and that the police had entered the premises with force and without announcing the existence of the warrants and the purpose of the search. Because the court found for the defendant on the issue of probable cause, it did not reach the question of the officers' entry into the premises, either as a matter of Massachusetts common law, or under the United States Constitution. *Id.* at 634.

[14] It is not clear what exceptions to the announcement rule were developed by English common law. See *Ker* v. *California,* 374 U.S. 23, 47-48 (1963) (Brennan, J., dissenting).

frustrated" had the announcement been made. *People* v. *Maddox*, 46 Cal. 2d 301, 306 (1956). See Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 802 (1924) (an exception to the general rule has evolved in cases where "the peril would be increased"). The California court in *Maddox* noted that "[w]ithout the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance." *Id.* See *United States* v. *Scott*, 520 F.2d 697 (9th Cir. 1975), cert. denied, 423 U.S. 1056 (1976); *Gilbert* v. *United States*, 366 F.2d 923, 932 (9th Cir. 1966),[15] cert. denied, 388 U.S. 922 (1967), 393 U.S. 985 (1968).

In the present case the judge found that there was a strong possibility that an announcement by the police of their identity and purpose would have endangered themselves or others. That finding is amply supported by the evidence that the defendant was suspected of participating in an armed robbery in which both handguns and a sawed-off shotgun had been used.[16] Moreover, the police testified that they considered the defendant armed and dangerous. Thus, the judge was warranted in finding that the police had reason to fear for their own safety as well as the safety of persons in the defendant's apartment.[17] In such cir-

---

[15] Other exceptions to the knock and announce rule have been recognized where the person inside the dwelling to be entered has knowledge of the officers' purpose and presence, see *Ker* v. *California*, 374 U.S. 23, 47 (1963) (Brennan, J., dissenting); *Commonwealth* v. *McDougal*, 2 Mass. App. Ct. 820 (1974), and cases cited, and where making an announcement would facilitate a suspect's escape or the destruction of evidence, see *Miller* v. *United States*, 357 U.S. 301, 309 (1958) (dictum) (citing *People* v. *Maddox*, 46 Cal. 2d 301 [1956]); *Ker* v. *California, supra* at 47 (Brennan, J., dissenting); *United States* v. *Cisneros*, 448 F.2d 298, 304 (9th Cir. 1971) (possibility of escape).

[16] It is not clear on the record whether any of the weapons used had been recovered at the time of the defendant's arrest.

[17] While it is unclear exactly how the police learned of the defendant's whereabouts, it appears that they knew that another adult and a young child lived in the apartment. The policeman's use of the "school bus" ruse permits an inference that the police had knowledge that a child lived at that address.

The judge assumed that despite the ruse the actions of the policemen rushing into the defendant's apartment with guns drawn constituted a

cumstances the failure of the police to identify themselves and announce their purpose is justified as a matter of our common law. We conclude there was no error in the denial of the defendant's motion to suppress.

*Delayed disclosure of inculpatory evidence.* During a recess on the fourth day of trial, a police officer informed the assistant district attorney, for the first time, of a statement allegedly made to him by the defendant at Boston police headquarters within a few hours of his arrest. When the officer inquired as to the whereabouts of codefendant Gregory Wilson, the defendant said, "I don't know why you're looking for Greg for [*sic*]. He wasn't involved in this holdup with us." The prosecutor immediately informed counsel for all defendants of the statement, and a voir dire was conducted to determine its admissibility. The officer testified that he had never written down the statement and had not previously brought it to the attention of the district attorney's office because he believed the defendant was lying and the statement was unimportant.[18]

Although the assistant district attorney stated several times that he did not intend to use the defendant's statement at trial, counsel for codefendant Gregory Wilson announced his intention to introduce it. When the trial resumed following the voir dire, the defendant's statement was elicited by the Commonwealth on direct examination of the police officer.

The defendant made a motion to exclude certain statements or for a mistrial, and to suppress the statement on voluntariness grounds; all were denied. He based these mo-

"violent entry," and, therefore, the police were required to announce their presence and purpose absent an exception to the rule. See, e.g., *Gatewood* v. *United States,* 209 F.2d 789, 791 (D.C. Cir. 1953). See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 806 (1924). Cf. *Sabbath* v. *United States,* 391 U.S. 585, 590 n.7 (1968), in which the Supreme Court of the United States left open the question whether entries obtained by ruse constitute "breakings" within the meaning of 18 U.S.C. § 3109.

[18] The officer testified that his memory was jogged by a question asked him by one of the defense counsel.

tions in part on a pretrial discovery agreement he had entered into with the assistant district attorney by which the Commonwealth promised to provide statements pursuant to a "Motion for Statements of Defendant" no later than one week prior to trial.

The defendant argues that the belated disclosure of the statement, which he characterizes as an implied admission,[19] denied him a fair trial. He claims that the trial judge's denial of his motion to exclude the statement or for a mistrial sanctioned the violation of the discovery agreement he entered into with the Commonwealth. *Commonwealth* v. *Blaikie,* 375 Mass. 601, 607-608 (1978). *Commonwealth* v. *Lewinski,* 367 Mass. 889, 900-903 (1975).

The judge below found, and the defendant's counsel acknowledged, that the delay in disclosing the defendant's statement was not caused by the malice or negligence of the police. The prosecutor, who immediately turned over the statement to all defense counsel, was acknowledged by all parties to be equally blameless. Compare *Commonwealth* v. *Whitehead,* 379 Mass. 640, 660 (1980) (judge properly unwilling to exclude surprise statement of witness where it is made in "good faith"), with *United States* v. *Lewis,* 511 F.2d 798, 800-801 (D.C. Cir. 1975) (trial judge found to have erred by failing to suppress defendant's incriminating statement where government had known about it and had agreed not to use any such statements).

However, the defendant's counsel asserts that had he known earlier of his client's statement, his decision on the advisability of entering into a plea agreement with the Commonwealth might have been different. He claims that he was therefore prejudiced by the late disclosure of the

---

[19] Since the officer's account of Cundriff's statement was clearly inculpatory of the defendant, the defendant does not claim that if "given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed." *Commonwealth* v. *Wilson,* 381 Mass. 90, 114 (1980). See *Commonwealth* v. *St. Germain,* 381 Mass. 256, 261-265 (1980).

statement. This assertion rests on unsupported speculation about both what he would have done and what the Commonwealth's response would have been. In *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895 (1979), where a similar argument was raised, we noted that, while the late disclosure of incriminating evidence may influence a defendant to be more willing to enter into a plea agreement, it may have exactly the opposite effect on the prosecutor. Furthermore, as was the case in *Gilbert*, the defense was not prevented from negotiating with the Commonwealth after the existence of the defendant's statement came to light. *Id.* This could have been accomplished during the continuance[20] granted by the judge after the defendant's statement was revealed.[21]

The defendant also claims that *Commonwealth* v. *Blaikie*, 375 Mass. 601 (1978), and *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975), required the judge to grant a new trial, and that the failure to do so denied him a fair trial. Again Cundriff's claim rests on sheer speculation. There is no showing that the defendant was significantly prejudiced at trial by the late disclosure of the statement or how a new trial would substantially cure any error. Defense counsel was given the better part of one day to make his own investigation into the circumstances surrounding the making of the statement. When the trial resumed, defense counsel did not seek any additional time for investigative purposes. He did not lodge any objection to resuming the trial based on lack of time to investigate properly the circumstances surrounding the making of the statement.[22]

---

[20] The judge continued the case for a day so that defense counsel could, if he wanted, "poke around at headquarters" to see what other officers might remember.

[21] Defense counsel also stated to the trial judge that had he known of Cundriff's statement earlier he might have moved for a severance. Although he could have done that any time in the trial, including after the statement was revealed, no such motion appears in the record.

[22] As a result of his investigation, defense counsel requested a voir dire on the voluntariness of the statement and on the issue of compliance with

While the defendant asserts that his defense was material-
ly hurt by having to meet unexpected testimony in the midst
of trial, the officer was cross-examined about the cir-
cumstances surrounding the defendant's statement, both at
the voir dire and at the trial. Therefore, he has not
demonstrated that his defense was hurt by the late dis-
closure. See *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895
(1979). Cf. *United States* v. *Lewis*, 511 F.2d 798 (D.C.
Cir. 1975) (trial judge found to have committed error by not
excluding incriminating statement elicited on cross-exami-
nation of defendant); *United States* v. *Padrone*, 406 F.2d
560, 561 (2d Cir. 1969) (new trial granted where in-
advertently nondisclosed statement first revealed on cross-
examination of defendant). The defendant argues that the
judge was wrong in focusing on the prejudice to the defend-
ant which might result from the admission of the statement.
We think, however, the judge was correct in focusing on
prejudice. See *Commonwealth* v. *Blaikie*, *supra* at 606
(second trial granted where previously undisclosed material
was "so different from the language in any pretrial informa-
tion disclosed to the defendant as to be prejudicial").
Without a showing of prejudice by the late disclosure of the
defendant's statement[23] and of how the granting of a new
trial would substantially remedy such prejudice, we cannot
conclude that a second trial would promote, as the defend-
ant asserts, a fairer and more efficient system of justice.
There is no error.

*Miranda* v. *Arizona*, 384 U.S. 436 (1966). The evidence as to compliance
with *Miranda* was extensive and the judge concluded that it was "just
plain" that "there's compliance with *Miranda*." The voir dire also con-
sidered the voluntariness of the statement apart from *Miranda* and,
although there is conflicting evidence whether the defendant was inten-
tionally struck by an officer while at the apartment, the judge found that
in the totality of the circumstances the statement made to the police was
voluntary. On appeal, these issues have not been briefed or argued. We
deem Cundriff's failure to brief these issues as a waiver. An "appellate
court need not pass upon questions or issues not argued in the brief."
Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[23] The defendant does not claim that at a second trial the statement
would be inadmissible.

*Charge to the jury.* The defendant argues that the judge's charge denied him due process of law because it stated a one-sided view of the interests at stake in the case, and presented the jurors with a distorted picture of their duties.

At the outset of his charge to the jury, the judge characterized the interests of the parties to the case. After stating that the defendants had a "personal, real interest" in the outcome, the judge said that the Commonwealth's interest, although it "may not be quite so apparent . . . it is, nonetheless, real and vital." The fundamental purpose of society, the judge said, was to "protect people found within its boundaries." He then told the jurors that when they returned with the verdict, their voices would "in that instant . . . [be] the voice of this Commonwealth." He then urged them to decide the case on the evidence, cautioning them that "[s]ympathy is not synonymous with justice," and "[c]ompassion is not the truth."

On appeal, the defendant asserts that the judge's characterization of society's interest as that of protecting the public,[24] while ignoring any interest in avoiding convictions based on insufficient proof, conveyed a view of society's interests that was partial to the prosecution. The defendant argues that this was compounded when the judge appeared to equate the interests of the jurors with that of the Commonwealth, and when he admonished the jurors not to be swayed by sympathy.

The judge's remarks dealing with sympathy and compassion were proper in that they directed the jury to consider solely the evidence presented at trial. While it would have been preferable if the judge had not appeared to equate the interests of the jurors and the interests of the Commonwealth, since the two are not synonymous, that alone

---

[24] Although on appeal the defendant claims to have objected and excepted to this entire portion of the judge's charge, he limited his comments to "the inappropriateness of sympathy in the jury's truth searching function."

does not invalidate the entire charge to the jury. Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context. *Commonwealth* v. *Watkins*, 377 Mass. 385, 388, cert. denied, 442 U.S. 932 (1979). *Commonwealth* v. *Gibson*, 368 Mass. 518, 527-528 (1975). *Commonwealth* v. *Whooley*, 362 Mass. 313, 319 (1972). *Commonwealth* v. *Aronson*, 330 Mass. 453, 457 (1953).

The passage to which the defendant objects accounts for less than one page out of twenty pages of jury instructions. Viewed in its entirety, the judge's charge was fair and well-balanced and did not mislead the jury as to their duties, functions and obligations. As a whole, the charge to the jury was well within constitutional limits.

*Judgments affirmed.*