COMMONWEALTH vs. JOHN F. PETETABELLA.

Bristol. December 10, 2010. - March 30, 2011.

Present: IRELAND, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

Practice, Criminal, Postconviction relief, New trial, Assistance of counsel,
    Instructions to jury, Jury and jurors, Empanelment of jury, Presumptions
    and burden of proof. Felony-Murder Rule. Rules of Criminal Procedure.
    Constitutional Law, Assistance of counsel, Double jeopardy, Fair trial,
    Jury, Retroactivity of judicial holding. Intoxication.

This court concluded, as a threshold matter, that a criminal defendant's appeal
    from the denial of his motion for a new trial, arising from his 1964 convic-
    tion of murder in the first degree, did not constitute a direct appeal, but
    rather an appeal from a collateral attack on his final conviction, where
    there was no basis on which to conclude that the defendant did not know-
    ingly and voluntarily waive his right to a direct appeal, in that the evidence
    supported the motion judge's finding that the defendant reasonably had ac-
    cepted his trial counsel's advice not to appeal his convictions, given that
    the defendant had achieved essentially the best outcome he could have
    hoped for in the circumstances (i.e., a sentence of imprisonment for life
    after the defendant had testified that he shot the victim in the back while
    the victim lay on the floor), and given that the defendant certainly would
    have been exposed to the possibility of a death sentence had he appealed at
    the time of his convictions and been retried. [181-183]
At a murder trial, the judge's instruction that the defendant had the right to
    remain inactive and secure until the government went forward with evidence
    to prove him guilty did not, in the context of the entire charge, create a
    substantial risk of a miscarriage of justice. [183-185]
At a 1964 murder trial that proceeded with thirteen jurors, none of whom
    were women, the judge's decision, unobjected to by counsel, to forgo
    selecting a fourteenth juror (while made for reasons that appear to have
    been impelled by a misplaced sense of chivalry that would today be regarded
    as discriminatory) did not amount to structural error or create a substantial
    risk of a miscarriage of justice. [185-187]
At a 1964 murder trial, there was no abuse of discretion in the defendant be-
    ing tried while shackled and under armed guard in front of the jury, in
    light of the customs and practices at the time of the trial to take stringent
    precautions with regard to court room security, given the execution-style
    killing of the victim. [187]
A judge hearing a criminal defendant's motion for a new trial correctly concluded
    that the defendant had, by his failure to object at trial, waived the issue of
    noise outside the court room at his trial; further, there was no error in the
    motion judge's conclusion that the trial judge adequately addressed the
    problem at trial. [187-188]

This court declined to consider whether a new rule of retroactivity announced by the United States Supreme Court applied to a rule of decisional law prohibiting, in criminal trials, jury instructions involving mandatory presumptions, where this court concluded that any error in an instruction on felony-murder at a murder trial was harmless beyond a reasonable doubt, given that the challenged language in the instruction did not affect the Commonwealth's burden of proof for the crime of felony-murder. [188-191]

At a murder trial, there was no error in the judge's use of the word "find" in a jury instruction on intoxication, where the charge, read as a whole, clearly placed the burden on the Commonwealth to prove each element of the offense beyond a reasonable doubt. [191-192]

A judge hearing a criminal defendant's motion for a new trial correctly declined to conclude that the defendant had been coerced by his trial counsel into testifying at his trial. [192-193]

INDICTMENT found and returned in the Superior Court on February 5, 1964.

A motion for a new trial, filed on May 21, 2008, was heard by *D. Lloyd Macdonald,* J.

*Richard J. Shea* for the defendant.

*Rachel J. Eisenhaure,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of December 28, 1963,[1] Jean Thibeault was shot and killed during a robbery of the bar he owned in Fall River. The defendant and two other men[2] were convicted of his murder and other offenses[3] on July 2, 1964. On his conviction of murder in the first degree, the jury recommended that the death penalty, then in effect, not be imposed, and the defendant was sentenced to life in prison.[4] He did not appeal. Nearly forty-four years later, on May 21, 2008, he filed

---

[1]There is a discrepancy in the record regarding the date of the murder. While the motion judge stated in his memorandum and order that the events in question took place on the night of December 22 and early morning of December 23, the testimony at trial was that the events transpired on the night of Friday, December 27, and early morning hours of Saturday, December 28, as set forth in the indictments. The discrepancy does not affect our decision.

[2]Joseph Robideau and Gerald Sousa.

[3]The defendant was also convicted on one indictment charging three counts of armed robbery (at the bar), G. L. c. 265, § 17; one indictment charging armed robbery (in a grocery store), G. L. c. 265, § 17; and one indictment charging assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A.

[4]Although the jury were instructed on all three theories of murder in the

a motion for new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). After an evidentiary hearing, a Superior Court judge denied an amended motion. The present appeal from that denial was filed in this court where it was docketed as a direct entry of an appeal from a conviction of murder in the first degree.

As a threshold matter, and for the reasons that follow, we conclude that the defendant's case is not here on direct appeal, but rather as an appeal from a collateral attack on a final conviction.[5] We further conclude that the motion judge's decision denying the motion for a new trial was not manifestly unjust, nor was the trial infected with prejudicial constitutional error. Accordingly, we affirm.

1. *Background.*[6] a. *The murder.* On the night of December 27, 1963, the defendant and Joseph Robideau were in Fall River to attend a bachelor party for their friend, Gerald Sousa. After drinking heavily, the defendant and Robideau robbed three employees of a Fall River market at gunpoint. During the robbery, the defendant "pistol whipped" a male employee, breaking the trigger guard of his pistol in the process.

After the robbery, the defendant and Robideau rejoined their

first degree, they were only asked to find whether the defendant was (1) guilty of murder in the first degree; (2) guilty of murder in the first degree, with a recommendation that the sentence of death be not imposed; (3) guilty of murder in the second degree; (4) not guilty by reason of insanity; or (5) not guilty.

[5]We acknowledge that the defendant has never been afforded plenary review of his conviction of murder in the first degree under G. L. c. 278, § 33E. We have exercised our discretion in the past to conduct § 33E review where a defendant failed to pursue or subsequently "waived" a direct appeal. See *Commonwealth* v. *Wilson*, 443 Mass. 122, 124 & n.2 (2004) (plenary review still conducted where defendant filed but never pursued "claim of appeal"); *Commonwealth* v. *Brito*, 402 Mass. 761, 762 n.1 (1988) ("Although we could consider [the defendant's waiver of direct appeal at oral argument] to be a waiver of claims of error, see Mass. R. A. P. 16 (a), [as amended, 428 Mass. 1603 (1999),] because of the gravity of a conviction of murder in the first degree, we have fulfilled our duty to give plenary review of the trial"). Unlike in those cases, the defendant's failure to appeal here was the product of a strategic decision made on the advice of his trial counsel, advice that we conclude was far from manifestly unreasonable. In these circumstances, we consider the failure to appeal from his murder conviction as a waiver of G. L. c. 278, § 33E, review.

[6]These facts are drawn from the testimony at trial, including the testimony of the defendant.

friends to continue celebrating. During the celebration, the defendant suggested that they "hit" a bar before closing time because, on a Friday night, a bar would be full of patrons with money. At approximately 1 A.M. on December 28, 1963, the defendant, Robideau, and Sousa arrived at Padden's Cafe, a bar located in Fall River. Among those present were Thibeault, the owner of the bar; Albert Brulotte, an employee; and Barbara Ferree, a patron. Robideau asked for change, but was told that the cash had been put away. Sousa went into the men's restroom and came out with a stocking over his face and a gun in his hand. The defendant, who was also armed with a gun, ordered Thibeault and Brulotte into the kitchen, instructing them to lie face down on the floor. The defendant and Sousa took the wallets of Thibeault and Brulotte. Robideau remained outside the kitchen, holding Ferree at knife point. When Thibeault, who was lying on the floor, "reach[ed] up for" the defendant, the defendant shot him once through the back, killing him. Sousa fired two shots at Brulotte, but Brulotte was not hit. As the defendant and Sousa ran out of the kitchen, Sousa took money out of Ferree's wallet and hit her over the head with his gun. The three men then left the bar.

b. *Trial.* The defendant, Robideau, and Sousa were tried together. At trial, the defendant presented evidence to support the defense theories of insanity and intoxication. Over the objection of his trial counsel, the defendant also took the stand to testify that Sousa was not the third man present at Padden's Cafe the night of the murder.[7] During cross-examination, the defendant admitted that he carried a gun, "hit" the market and the bar, and shot Jean Thibeault as he lay on the kitchen floor. All three defendants were convicted of murder in the first degree and all were spared the death penalty.

c. *Motion for a new trial.* The defendant's motion for a new trial included an affidavit in which he averred that after his conviction his trial counsel informed him that he could not appeal because he had admitted guilt.[8] Consequently, he did not

_____

[7] At trial, the defendant testified that a man known only as "Red," and not Sousa, was the third man committing the robbery at Padden's Cafe. At the hearing on his motion for a new trial, the defendant admitted that he lied at trial and Sousa was, in fact, the third robber.

[8] The defendant notes that according to the Board of Bar Overseers, his trial

appeal. He also claimed that there were several structural and other errors made at his trial, which we address in turn.

2. *Discussion.* a. *Standard of review.* A new trial may be granted "at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b). "Rule 30 (b) motions . . . filed after conviction and sentencing are considered collateral attacks on final decisions." *Commonwealth* v. *Lopez,* 426 Mass. 657, 662 (1998). "A motion for a new trial is addressed to the sound discretion of the trial judge, and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, or unless the trial was infected with prejudicial constitutional error." *Commonwealth* v. *Russin,* 420 Mass. 309, 318 (1995). "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Grace,* 397 Mass. 303, 307 (1986). In a collateral attack on a criminal conviction, claimed errors are reviewed to determine whether they create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Randolph,* 438 Mass. 290, 294-296 (2002).

b. *Failure to appeal.* In his amended motion for a new trial, the defendant asserts that trial counsel incorrectly informed him that he could not appeal from his convictions. He asserts that the waiver of his right to appeal was the result of ineffective assistance of counsel and could not have been knowing and voluntary. Consequently, he contends that his appeal should be considered as a direct appeal from his convictions and not the appeal of a failed collateral attack. After assessing the credibility of the defendant's testimony at the evidentiary hearing (which he found lacking) and reviewing the trial transcript, the motion judge concluded that the defendant's trial counsel had not advised the defendant that he could not appeal, but rather, advised him not to appeal for two related reasons: first, because the defendant had "won" at trial when he was spared the death penalty; and second, because the defendant likely would have faced the death penalty had he prevailed in receiving a new trial. The judge

counsel had been admitted to the bar in 1949 and would be over eighty years old today. The defendant made no attempt to contact him.

further concluded that the defendant reasonably accepted his counsel's advice.

The judge's findings are sound and are supported by the evidence and his finding that trial counsel "was diligent in every aspect of his representation of the defendant at trial. Thus, it is unlikely that on such a basic issue as the defendant's statutory right of appeal . . . pursuant to G. L. c. 278, § 33E, that counsel would have disregarded his client's preference."

Further, the reasons why trial counsel would have discouraged the defendant from appealing from his convictions were far from manifestly unreasonable. First, the outcome of trial was essentially a "win" for the defendant, especially after he testified that he shot Jean Thibeault in the back while he lay on the floor. From that point, trial counsel's aim was to spare the defendant the death penalty. In closing, he pleaded with the jury: "[The defendant] doesn't say that what he did was right. Nobody makes that claim at all. But I ask you to consider these things. And you, as society, are you going to make the final rejection and say, 'You don't belong here?' " The jury were persuaded and recommended that the death penalty not be imposed. Accordingly, counsel would have had little reason to recommend an appeal where the defendant achieved the outcome that was essentially the best he could have hoped for in the circumstances.

Second, trial counsel's recommendation was warranted based on the possibility that the defendant would face the death penalty if granted a new trial. The defendant argues on appeal that the United States Supreme Court's decision in *Sattazahn* v. *Pennsylvania*, 537 U.S. 101 (2003), applies here. In that case, the Court held that in the death penalty phase of a capital murder case, the jury in effect "acquit[]" a defendant of the death penalty by finding "that the government failed to prove one or more aggravating circumstances beyond a reasonable doubt." *Id.* at 106, 108. Consequently, the double jeopardy clause of the Sixth Amendment to the United States Constitution bars retrial on the issue of imposing the death penalty. *Id.* at 107-109, citing *Bullington* v. *Missouri*, 451 U.S. 430 (1981), and *Arizona* v. *Rumsey*, 467 U.S. 203 (1984). The controlling law at the time of the defendant's convictions, however, was to the contrary. See *Stroud* v. *United States*, 251 U.S. 15, 17-18 (1919) (double jeopardy

clause did not bar imposition of death penalty at new trial). See also *Sattazahn* v. *Pennsylvania, supra* at 107. The case of *Stroud* v. *United States, supra,* was cited with approval in *Makarewicz* v. *Commonwealth,* 346 Mass. 478, 481 (1963), and its reasoning was applied in *Commonwealth* v. *Arsenault,* 361 Mass. 287, 293-296 (1972).

Accordingly, had the defendant appealed at the time of his convictions and been retried, he certainly would have been exposed to the possibility of a death sentence, something he had just successfully avoided. As the motion judge stated, because "the defendant admitted to all the material facts of the Commonwealth's case . . . a second conviction was a near certainty and with it the risk of a death sentence." Trial counsel's advice in these circumstances was not ineffective even measured against our current standard of ineffectiveness. See *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974) ("whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer"). We see no basis on which to conclude that the defendant did not knowingly and voluntarily waive his right to a direct appeal.

c. *Claims of structural error.* "Structural error is a particular type of error. Generally, it is error that 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' Structural errors are fundamental defects in a trial. They have been recognized in limited circumstances, occur rarely, and require automatic reversal without a showing of actual harm." *Commonwealth* v. *Hampton,* 457 Mass. 152, 163 (2010), quoting *Washington* v. *Recuenco,* 548 U.S. 212, 218-219 (2006).

i. *Presumption of innocence instruction.* The defendant argues that the trial judge's instruction regarding the presumption of innocence was a structural error because it suggested to the jury that the defendant had the burden of proving his innocence once the Commonwealth began presenting its case. The instruction given was:

"A defendant need not present evidence of his innocence. He has the right to remain inactive and secure *until*

the government goes forward with evidence to prove him guilty; but a defendant has the right to take the stand if he wishes to do so. He is not compelled to take the stand; and if he doesn't take the stand, no adverse inference can be drawn against him." (Emphasis added.)

The defendant particularly takes issue with the word "until" because it implies that the burden of proof shifts once the Commonwealth starts presenting any evidence.

The motion judge held that an error in the presumption of innocence instruction would not constitute structural error because a presumption of innocence instruction is not required in every case. "Instructions on the presumption of innocence are not necessary elements of due process of law, . . . and have caused much confusion. . . . The presumption of innocence is not a presumption in the usual sense, but a shorthand reference to the premises from which a criminal trial proceeds. . . . Thus we have held that judges need not give any particular content to the phrase 'presumption of innocence,' if the instructions make clear that an indictment does not imply guilt, and that the jury must base their decision on the evidence, and not on 'suspicion or conjecture.' " (Citations omitted.) *Commonwealth* v. *Drayton*, 386 Mass. 39, 46 (1982), quoting *Commonwealth* v. *DeFrancesco*, 248 Mass. 9, 13 (1924). See *Commonwealth* v. *Sleeper*, 435 Mass. 581, 600 (2002), citing *Kentucky* v. *Whorton*, 441 U.S. 786, 789-790 (1979) ("failure to give a presumption of innocence instruction does not in and of itself violate the Constitution"). An error in a presumption of innocence instruction, therefore, does not rise to the level of a structural error. We turn to whether the instruction in this case created a substantial risk of a miscarriage of justice.

The motion judge held that although the instruction was flawed when considered standing alone, when read in context, it did not create a substantial risk of a miscarriage of justice. "Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). The charge given to the jury contained all the elements required when instructing on the presump-

tion of innocence. Immediately preceding the presumption of innocence instruction at issue, the judge properly told the jury:

> "The presumption of innocence, to which every defendant in a criminal case is entitled, means that the defendant shall not be found guilty upon assumption, upon suspicion, conjecture, or speculation; but a defendant may only be found guilty upon evidence of his guilt actually produced in court. The fact that a defendant has been suspected or charged with a crime, the fact that he has been arrested or held in custody, or the fact that he has been complained of or indicted, shall not in any way be deemed as evidence of his guilt, and shall not put him in an unfavorable light before the court and the jury."

Following the flawed portion of the instruction at issue, the judge further explained that, "[i]n a criminal case the Commonwealth has the burden of proving a defendant guilty beyond a reasonable doubt in order to convict him of any offense with which he may be charged." He went on to fully explain the quality and degree of proof and the meaning of "reasonable doubt." We agree with the motion judge that, in the context of the entire charge, the challenged language — "[the defendant] has the right to remain inactive and secure until the government goes forward with evidence to prove him guilty" — did not create a substantial risk of a miscarriage of justice.

    ii. *Exclusion of women from the jury.* The defendant alleged in his amended motion for new trial that women were excluded from the jury and that such exclusion amounts to structural error warranting a new trial. See *Vasquez* v. *Hillery*, 474 U.S. 254, 263 (1986) ("when a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained"). Cf. *Commonwealth* v. *Hampton*, 457 Mass. 152, 163 n.9 (2010). During jury selection, eleven women were questioned. None of these women was seated as a juror; three were excused by the judge for cause and eight were struck by counsel for the defendants. Thirteen men were seated as jurors. The judge intended to seat fourteen jurors in order to have two alternates available; however, no fourteenth

juror was ever seated. After the thirteenth juror was seated, a woman was next in the venire. The judge asked, "You have got thirteen men now. You will not want to have only one woman, will you?" The prosecutor gave the only recorded response, replying, "No, your Honor." The judge then stated, "We have decided we would go on with two women, but not with just one. [Prospective female juror], you are excused. As a matter of fact, I guess all the remaining women can be excused, if there are any more out there." The defendant did not object. Four men were then questioned, but all were excused. The trial proceeded with thirteen jurors.

The motion judge ruled that any error was waived because it was defense counsel's peremptory challenges that struck women from the jury. The defendant argues on appeal that of the eleven women struck from the jury, his counsel only struck one; counsel for Sousa and Robideau struck seven; and three were excused for cause by the judge. The Commonwealth asserts, and we agree, that because a fourteenth juror was never seated, women were not unconstitutionally excluded from the jury. The issue before us is not who was responsible for striking the prospective women jurors; rather, it is the manner in which the trial judge was poised to choose a man over a woman based solely on gender for the fourteenth seat on the jury. Had he done so, the defendant's constitutional right to a fair trial plainly would have been implicated.[9]

The defendant has neither a constitutional nor a statutory right to the empanelment of more than twelve jurors.[10] Although the thirteen jurors empanelled happened to be men, the process by which they were empanelled evinced no bias against or unconstitutional exclusion of women. During voir dire, men and women were questioned in the same manner and without regard to their gender. While it is accurate that eleven women were

---

[9]Nevertheless, even structural errors can be waived when they are not properly preserved. *Commonwealth* v. *Burnett*, 428 Mass. 469, 474-475 (1998) (error in reasonable doubt instruction). *Mains* v. *Commonwealth*, 433 Mass. 30, 33 n.3 (2000) (same). See *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 105-106 (2010) (right to public trial).

[10]Pursuant to G. L. c. 234, § 26, the judge is required to empanel only twelve jurors in capital cases. Nonetheless, the judge may empanel up to sixteen jurors. G. L. c. 234, § 26B.

excused because they were challenged by the defendants or excused by the judge for cause, more than thirty men were similarly challenged or excused. The decision of the judge, unobjected to by defense counsel, to forgo selecting an additional juror, while made for reasons that appear to have been impelled by a misplaced sense of chivalry that would now be regarded as discriminatory, did not amount to structural error or create a substantial risk of a miscarriage of justice.

iii. *Defendant in shackles.* The defendant asserted that he was tried in shackles and under armed guard in front of the jury, and that trial counsel objected to his treatment in this regard. The defendant cites to *Deck* v. *Missouri*, 544 U.S. 622 (2005) (*Deck*), in support of his argument that this was structural error. In that case, the United States Supreme Court held that it is unconstitutional to "routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." *Id.* at 633. However, as the motion judge pointed out, the rule announced in *Deck* is not absolute; "[i]t permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants." *Id.* The motion judge reasoned, and we agree, that it was not an abuse of discretion in light of the customs and practices at the time with regard to court room security, for the trial judge to take stringent precautions, "given the defendant's execution-style killing of [Jean Thibeault]." Because we find no error even under *Deck*, which was decided after the defendant's conviction, we need not decide whether *Deck* is retroactive.

iv. *Noise outside the court room.* The defendant contends that constant noise outside the court room impaired the ability of the jury to hear the evidence and violated his due process rights and right to a fair trial under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. The trial was held during the month of June, and the defendant testified at the motion hearing that due to the heat, the windows were left open, and even the trial judge commented on the noise from outside the court room.

The motion judge held that the issue was waived because the

defendant made no objection at trial. He also found that, after a review of the trial transcript, the trial judge adequately addressed the problem at trial by asking the witness (who was apparently testifying during the noise) to repeat an answer or speak louder.[11] There was no error in the motion judge's ruling.

d. *Jury instructions.* The defendant claims several errors in the judge's final instructions to the jury. Specifically, the defendant complains about the judge's instructions that the "law justly says that he must be taken to intend all consequences which naturally flow from his act," and that "there can be no doubt of the general rule of law that a person engaged in the commission of an unlawful act is legally responsible for any consequences which may naturally or necessarily flow from it." Both of these statements were made in the context only of the judge's instruction on felony-murder. He also complains that the judge misused the word "find" in his instruction on intoxication. The defendant argues that, taken together, the challenged language shifted the burden of proof to him with regard to some of the elements of the three theories of murder on which the jury were instructed and with regard to the defense of intoxication, having the effect of partially directing a verdict on the elements of premeditation, intent, malice aforethought, and intoxication.

The motion judge ruled that when the charge is considered as a whole, the jury were clearly instructed that it was the Commonwealth's burden to prove the defendant was guilty beyond a reasonable doubt. He also concluded that any errors in the burden shifting instructions were harmless beyond a reasonable doubt because there was ample testimony, including that of the defendant, that the defendant planned and executed the robbery and shooting at the bar.

i. Sandstrom *error.* The first challenged instruction includes a mandatory presumption that was later forbidden by the United States Supreme Court in *Sandstrom* v. *Montana,* 442 U.S. 510, 515 (1979) (*Sandstrom*) ("*Sandstrom's* jurors were told that '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.' They were not told that they

---

[11]The defendant agreed on cross-examination at the motion hearing that during the trial, the judge "would address the issue when [the defendant was] unable to [hear the proceedings]."

had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory"). The defendant was convicted fifteen years before *Sandstrom*, and its holding would not apply to his case unless *Sandstrom* applied retroactively. As the Commonwealth details in its brief, there is a question whether *Sandstrom* is retroactive in Massachusetts today. After *Sandstrom* was decided, we subsequently determined that it applied retroactively. See *Commonwealth* v. *White*, 392 Mass. 282, 285 (1984); *DeJoinville* v. *Commonwealth*, 381 Mass. 246 (1980). However, subsequent to these decisions, the United States Supreme Court adopted a new rule of retroactivity, see *Teague* v. *Lane*, 489 U.S. 288, 311 (1989), which we then adopted in *Commonwealth* v. *Bray*, 407 Mass. 296, 300-301 (1990). The Commonwealth notes a number of circuit courts of the United States Court of Appeals have determined that *Sandstrom* is not retroactive under the rule set out in the *Teague* case. In *Commonwealth* v. *Medina*, 430 Mass. 800, 802 n.3 (2000), which was decided after the *Teague* and *Bray* cases, we recognized that *Sandstrom*-type errors could be challenged by defendants tried before *Sandstrom*. However, we have yet to evaluate the rule in *Sandstrom* under the retroactivity rule adopted in *Commonwealth* v. *Bray, supra*. Because we conclude that any error in the instruction was harmless beyond a reasonable doubt, we decline to do so today.

"An unconstitutional burden-shifting instruction is not grounds to upset a verdict if it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Commonwealth* v. *Nolin*, 448 Mass. 207, 218 (2007), quoting *Chapman* v. *California*, 386 U.S. 18, 24 (1967). "Finding that an improper instruction was harmless beyond a reasonable doubt is the equivalent of saying that the error was 'unimportant in relation to everything else the jury considered on the issue in question,' requiring the reviewing court 'to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.' " *Commonwealth* v. *Nolin, supra*, quoting *Yates* v. *Evatt*, 500 U.S. 391, 403, 404 (1991). We first look to the evidence the jury

considered in light of the instructions they received and then "weigh the probative force of that evidence as against the probative force of the presumption standing alone." *Commonwealth* v. *Medina, supra* at 803, quoting *Yates* v. *Evatt, supra* at 404.

Although the defendant presented evidence of his intoxication and insanity, his testimony about the events that took place on the night of the murder, and the testimony of the other eyewitnesses,[12] combined to make a powerful case of felony-murder. The defendant testified that he had a conversation with "Red" (later admitted to be Sousa) in which it was decided that "Red," Robideau, and the defendant would "stick up" a place. He testified that the three men then decided that they would "stick up" a bar because the defendant suggested that a Friday night was "a good time to hit a bar." The defendant testified that earlier in the night, he had taken a nylon stocking from a female friend's home, and that "Red" wore the stocking during the robbery of the bar. He testified to taking Jean Thibeault's wallet and then shooting him in the back. He testified that he later counted the money from the wallet (and the wallets of the other two victims at the bar) and split it between himself and Robideau, and after the shooting, he ran for a few blocks and then hid in a yard. On returning to the celebration, the defendant admitted that he instructed one of the men at the party to burn the wallets. The defendant finally testified that the next day he and Robideau went back to Providence, Rhode Island, "looking for a place to hide."

The challenged instruction was given during the judge's instruction on felony-murder and reads, in relevant part:

> "It is murder, although the person engaged in committing the lesser crime, for example, robbery, does not actually intend that death follow his act. If one uses a deadly weapon, or a weapon likely and suited to cause death, and intends only to injure and not to kill, but in fact inflicts an injury which causes death, he is guilty of murder. *The law justly says that he must be taken to intend all the consequences which naturally flow from his act.* The motive for that act was the wilful carrying out of his own plans

---

[12]The other victims of the robbery in the bar, Albert Brulotte and Barbara Ferree, also testified.

and designs regardless of the rights of others. That is malice aforethought. In such a case, the killing would be murder." (Emphasis added.)

The defendant argues that this instruction relieved the Commonwealth's burden to prove that the defendant intended to commit armed robbery and intended to kill.

As noted above, the challenged language was given only during the felony-murder instruction. Felony-murder is a type of murder in the first degree committed "in the commission or attempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1. To find a defendant guilty of felony-murder, a jury are only required to find that the defendant intended to commit an underlying felony during which a death occurred. See *Commonwealth* v. *Gricus,* 317 Mass. 403, 411-412 (1944). The language in the instruction, that the "law justly says that he must be taken to intend all the consequences which naturally flow from his act," has no bearing on the Commonwealth's burden of proving the defendant's intent to commit the underlying felony, armed robbery. It merely explains, not incorrectly, that in the context of felony-murder, a defendant who uses a deadly weapon in the course of committing an armed robbery will be held responsible for the injuries or deaths that occur as a consequence, regardless of his intent to inflict those consequences.

The next sentence challenged by the defendant, that "there can be no doubt of the general rule of law that a person engaged in the commission of an unlawful act is legally responsible for any consequences which may naturally or necessarily flow from it" also comes only as part of the judge's explanation to the jury of the concept of felony-murder. It similarly does not affect the Commonwealth's burden of proof for the crime of felony-murder because the Commonwealth need only prove that the defendant intended to commit the unlawful act of armed robbery. The uncontradicted evidence in this case was that the defendant, while armed, planned and participated in the armed robbery. Consequently, even if *Sandstrom* were to apply retroactively to this case, any error was harmless beyond a reasonable doubt.

ii. *"Find" language.* The final challenged language is not erroneous. The defendant challenges the judge's use of the word

"find" in his instruction that "it becomes incumbent upon the Court to discuss with you what would be the effect of drunkenness or what would be the effect of intoxication, if you should *find* that any or either or all of these defendants were intoxicated or were drunk" (emphasis added). He argues that this language "clearly suggested that [the] defendant had a burden of proof." This language, while disfavored, see *Connolly* v. *Commonwealth*, 377 Mass. 527, 532-538 (1979), is not in error when the charge, read as a whole, clearly places the burden on the Commonwealth to prove each element of the offense beyond a reasonable doubt. See *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980).

We have noted that such "finding" language is most offensive when given in connection with "complete, malice-negating defenses." *Commonwealth* v. *Waite*, 422 Mass. 792, 805 (1996), and cases cited. See *Commonwealth* v. *Costello*, 392 Mass. 393, 405 (1984) ("Contrary to the defendant's assertion, intoxication is not a defense to murder in the first degree that the Commonwealth must disprove. In this respect, it is quite unlike that narrow category of defenses [such as self-defense] that by their very nature negate essential elements of a crime and for this reason their nonexistence must be proved by the Commonwealth beyond a reasonable doubt"). The defense of intoxication is not a malice-negating defense. There is no burden to be shifted here. See *Commonwealth* v. *Waite*, *supra* at 805-806. Further, the complete charge repeatedly emphasized that the Commonwealth bore the burden of proving the elements of each offense beyond a reasonable doubt. The judge explained in detail the meaning of reasonable doubt and reiterated the Commonwealth's burden when instructing on the elements of armed robbery and murder. He also emphasized the Commonwealth's burden immediately prior to providing the instruction on intoxication and during the instruction on mental capacity. There was no error.

e. *Defendant's waiver of right not to testify.* Finally, the defendant testified at the motion hearing that he was coerced into testifying when his trial counsel told him that he would face the death penalty if he did not. The motion judge found this testimony not to be credible and contrary to the trial record.

The record reflects that at trial, it was Sousa who called the defendant as a witness. When the defendant's trial counsel objected, the judge explained to the defendant:

"Before you take the stand . . . your attorney has objected to your taking the stand as a witness. He has no right to claim a privilege for you, but you, in your own behalf, have the privilege of not testifying where you are a defendant in these cases. However, if you take the stand and wish to testify, you are waiving any privilege that you may have. It is your decision to make. If you want to testify, all well and good."

The defendant responded, "Yes, sir." The judge then asked, "What do you want to do?" and the defendant replied, "Want to testify." The defendant has presented no evidence other than his testimony at the motion hearing that his decision to testify for Sousa was coerced by trial counsel. We see no reason to disturb the motion judge's findings on this subject.

3. *Conclusion.* There being no manifest injustice in the denial of the defendant's motion for a new trial and no basis on which to conclude that the underlying trial was infected with prejudicial constitutional error, the denial of the defendant's motion is affirmed.

*So ordered.*